UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


PHILLIP COLEMAN,

                Petitioner,                                Hon. Paul L. Maloney

v.                                                  Case No. 1:08-CV-391

KENNETH McKEE,

                Respondent.

_____/


## REPORT AND RECOMMENDATION

This matter is before the Court on Coleman's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Coleman's petition be **denied**.


## BACKGROUND

As a result of events that allegedly occurred in December 2001, Petitioner was charged with one count of first degree criminal sexual conduct. A jury trial on this charge was conducted in June 2004. (Dkt. #21-26). The jury was unable to reach a unanimous verdict, however, after which a mistrial was declared. (Dkt. #27). A second jury trial was conducted later that year. Several individuals testified at this second trial. The relevant portions of their testimony are summarized below.

1

**Latotiana McClain**

As of December 2001, near the time of Latotiana's twelfth birthday, Latotiana and Elissia Sherrill were roughly the same age, attended the same school, and were "best friends." (Trial Transcript, December 1, 2004, 325-34). Latotiana had known Elissia's mother, Carletta Coleman, since she "was a baby" and had known Petitioner since she was "a little kid." (Tr. 326, 330). Carletta Coleman was at the time married to Petitioner. (Tr. 326). Carletta Coleman was friends with Latotiana's mother, Martha Miller. (Tr. 328-29). Latotiana liked Coleman and had never "had any problems" with her prior to December 2001. (Tr. 327-28). Latotiana knew that Petitioner was a police officer and trusted him. (Tr. 331). Latotiana never heard her mother say anything negative about Petitioner. (Tr. 331).

One particular day in December 2001, Latotiana and her sister, along with Elissia and her sister were playing at Latotiana's residence. (Tr. 331-34). Latotiana later asked her mother if she could "stay the night" at Elissia's house. (Tr. 334). Latotiana's mother agreed, after which Elissia telephoned her mother to ask permission for Latotiana to stay the night with her. (Tr. 334). Elissia initially spoke with her mother, who instructed Elissia to instead ask Petitioner. (Tr. 334). After speaking with Petitioner, Elissia handed the telephone to Latotiana, stating, "he wants to talk to you." (Tr. 334-35). Petitioner told Latotiana "to keep an eye on the kids" and "make sure they weren't going to mess up the house." (Tr. 335). Petitioner then told Latotiana that "whatever goes on between me and you will stay between me and you, right?" (Tr. 335). Latotiana answered, "yes" believing that Petitioner was referring to "a surprise for the kids or something." (Tr. 335-36).

When Latotiana, Elissia, and Elissia's sister returned to Elissia's residence, nobody else was home. (Tr. 336). The trio watched television and later fell asleep on a couch. (Tr. 336).

2

Latotiana later awoke when Petitioner whispered something in her ear.  (Tr. 337).  The next thing Latotiana remembered was Petitioner lying her down on his bed.  (Tr. 337).  Petitioner then removed Latotiana's pants and panties and asked Latotiana if she had ever "done it before."  (Tr. 338).  Petitioner then laid on top of Latotiana and attempted to penetrate her vagina with his penis.  (Tr. 338-42).  Latotiana was "afraid" and "shaking."  (Tr. 339).  Petitioner told Latotiana that "he wasn't going to hurt [her]."  (Tr. 341).  For a "couple of minutes" Petitioner attempted without success to penetrate Latotiana's vagina after which he got up and walked over to his dresser.  (Tr. 341-43).  Latotiana then "jumped off the bed, put on [her] clothes and ran to the bathroom."  (Tr. 343).  After using the bathroom, Latotiana returned to the couch (Tr. 344).  Latotiana later heard Carletta "banging" on the back door trying to gain entrance to the house.  (Tr. 345).  Carletta "wonder[ed] why the door was locked."  (Tr. 345).

When Latotiana awoke the next morning, she was "scared" and "didn't say nothing to nobody."  (Tr. 346).  When Carletta asked Latotiana what was wrong, Latotiana began crying and told her that Petitioner "tried to have sex with me."  (Tr. 346-47).  Latotiana felt safe telling Carletta because Petitioner had already departed the house earlier that morning.  (Tr. 350).  Latotiana did not immediately inform her mother because she "knew it would upset her and [Latotiana] wouldn't know how [her mother] would react to it."  (Tr. 350).  Latotiana did not tell her mother about Petitioner's actions until several months later after a police officer questioned her mother about the incident.  (Tr. 352-53).  Latotiana later spoke with Shawn Baker and Sue Johnson about the incident.  (Tr. 354).  After the incident in question, Latotiana continued to visit Elissia's house, but only when Carletta Coleman was present and Petitioner was not present.  (Tr. 370-71, 375).

**Martha Miller**

Miller and Carletta Coleman met when Latotiana was approximately four or five years of age.  (Trial Transcript, December 2, 2004, 401-02).  Miller and Coleman became best friends and "basically did everything together with [their] kids."  (Tr. 402).  Miller later met Petitioner when Petitioner became involved with Coleman. (Tr. 404-05).  Miller thought Petitioner was a "good guy" and trusted Coleman and Petitioner with her children.  (Tr. 409-10).  Latotiana and Carletta's daughter, Elissia, became best friends.  (Tr. 406, 414).  The two "were inseparable" and spent a great deal of time at each other's home.  (Tr. 406-07).  Prior to December 2001, there were never any problems between Latotiana and Elissia.  (Tr. 414-15).

In September 2002, Miller was contacted by George Hubbard of the Muskegon Heights Police Department.  (Tr. 415-23).  Hubbard informed Miller that Latotiana Had been "touched" in an incident the prior December.  (Tr. 414-25).  This was the first time that Miller had been informed of this matter.  (Tr. 425-28).  Miller then spoke with Latotiana who for the first time told her mother about the incident.  (Tr. 425-26).  Miller indicated that prior to the incident in question Latotiana had not been in trouble at school or engaged in attention seeking behaviors.  (Tr. 431-32).

**Melissa Peterson**

As of September 26, 2002, Peterson was employed as Medical Coordinator and Child Specialist with the Children's Advocacy Center, a non-profit organization that provides various services to children.  (Trial Transcript, December 2, 2004, 457-58, 513).  Peterson earned a Master's Degree in Social Work and in her capacity as Medical Coordinator and Child Specialist, she

conducted forensic interviews, assessments, safety education, and assists with medical examinations. (Tr. 458, 464).

Peterson emphasized that when interviewing children it is important to do so "without leading questions." (Tr. 464-65, 469-70). Instead, Peterson uses "open-ended questions," so that she can "obtain a clean statement in the child's own words of what happened to them without leading." (Tr. 464-65, 469). Peterson stated that the objective of every interview is to obtain "the truth, either what happened or what didn't happen with the child." (Tr. 465). Peterson testified that part of this process includes "trying to find signals or red flags that a child may be coached or brainwashed or influenced in some way." (Tr. 467).

Peterson interviewed Latotiana McClain on September 26, 2002, at the behest of the Michigan State Police. (Tr. 513, 517). When Peterson interviewed Latotiana she used open-ended questions and was "looking for signs that she had been coached or that she was lying." (Tr. 472-73). Peterson's first question to Latotiana was "if she knew why she was here today," in response to which Latotiana immediately stated "because [Petitioner] tried to have sex with her." (Tr. 474-75). When asked what she meant by "tried to have sex with her," Latotiana responded that Petitioner "was trying to put his penis into her vagina and was pushing it against the opening." (Tr. 475). Latotiana told Peterson that Petitioner eventually stopped and "went to get something off the dresser" at which point she "left the room." (Tr. 477). Latotiana told Peterson that this occurred in Petitioner's bedroom. (Tr. 477). Peterson testified that during her interview of Latotiana she did not observe any indications that Latotiana "was making things up" or that she had "been influenced or coached in some way." (Tr. 479). Peterson further indicated that she discerned "none of the red flags or signals" that she was trained to look for. (Tr. 479-80). After interviewing Latotiana,

Peterson then assisted Dr. Buchanan with a medical examination of Latotiana.  (Tr. 480).

Peterson testified that in her experience it was not unusual for a child who has "gone through something" to not tell a parent for quite some time and to instead first report the matter to "school personnel or friends."  (Tr. 489-90).  Peterson said that kids often wait to inform a parent because they "are afraid of their parents' reaction."  (Tr. 491-92).  Peterson also testified that it was not unusual for a child to not "fight back or scream. . .when they're being assaulted by someone they love and trust."  (Tr. 495).

**Gerald Buchanan**

Buchanan earned his Medical Doctor degree in 1982 and became the Medical Director of the Child Advocacy Center in 1997.  (Trial Transcript, December 2, 2004, 546-47).  Dr. Buchanan was permitted to testify as an expert in the field of child sexual abuse medical examinations.  (Tr. 549-50).  Dr. Buchanan examined Latotiana McClain on September 26, 2002.  (Tr. 552).  This examination revealed no evidence of sexual assault.  (Tr. 568-70, 579).

Dr. Buchanan testified that because the hymen "does not cover the vaginal opening in its entirety," there is no such thing as a "virginity test" from which it can be determined "whether or not there's ever been sexual penetration" of a girl.  (Tr. 557-59).  To emphasize this point, the doctor described a recent study of 36 pregnant girls in which only two of the 36 girls displayed "evidence of penetration."  (Tr. 558-59).  Dr. Buchanan testified that the lack of medical evidence of sexual assault, however, does not mean that penetration did not occur.  (Tr. 563-65).  Dr. Buchanan further testified that a medical examination conducted nine months after the incident in question would be "very unlikely" to reveal physical evidence of abuse.  (Tr. 564).

**Shawn Baker**

Baker testified that she was employed as a Michigan State Trooper and had spent the previous three years investigating criminal sexual conduct cases. (Trial Transcript, December 2, 2004, 581). As part of the investigation into this matter, Baker interviewed Latotiana McClain. (Tr. 583-84). When conducting this interview, Baker used open-ended questions. (Tr. 590). Sue Johnson, with Child Protective Services, was also present during this interview. (Tr. 589).

Trooper Baker initially asked Latotiana "if she had any idea why we were there," in response to which Latotiana responded "my godsister's daddy raped me." (Tr. 591). Baker then asked Latotiana to "explain. . .what happened." (Tr. 591). Latotiana told Baker that she was asleep on the coach when Petitioner awoke her. (Tr. 605). She did not remember how she got to Petitioner's bedroom, but that once there Petitioner asked her if "she's ever done this before." (Tr. 605). Petitioner then removed Latotiana's underclothes and attempted to penetrate her vagina with his penis. (Tr. 605). At some point, Petitioner walked over to his dresser, at which point Latotiana "jumped off the bed and left the room." (Tr. 605). Latotiana also told Trooper Baker that she had spoken with Petitioner on the telephone earlier on the day in question and that during this conversation Petitioner had told her something along the line of "whatever happens between me and you will be between us." (Tr. 605-06).

Latotiana's description of the events in question remained "consistent" and Baker discerned no "red flags or signals" to indicate that Latotiana was lying, had any motivation to lie, or had been coached or told what to say. (Tr. 589-90).

**Sue Johnson**

Johnson testified that she had been employed as an investigator for Children's Protective Services for more than seventeen years. (Trial Transcript, December 3, 2004, 616-17). Johnson was permitted to testify as an expert in the field of "child sexual abuse interviewing of children." (Tr. 638). Johnson was also permitted to offer opinion testimony regarding "typical reactions she's experienced in interviewing victims of child sexual abuse." (Tr. 642-44).

Johnson testified that children "often" fail to inform a parent "right away about sexual abuse." (Tr. 644-45). Johnson testified that it is "typical" for a child "to continue to have contact with an offender when that offender is someone they know and trust and care about." (Tr. 645). Johnson further testified that it is "typical" for a child "to not cry out or to ask for help or to scream while the assault is occurring when it involves someone they know, care and trust." (Tr. 645).

On September 19, 2002, Johnson accompanied Trooper Baker when she interviewed Latotiana McClain. (Tr. 623-24, 654). The interview of Latotiana was conducted through the use of open-ended questions. (Tr. 639). Latotiana indicated that Petitioner had attempted to "push" his penis "inside her vagina." (Tr. 674-75). According to Latotiana, Petitioner then "went over to a dresser in the bedroom," at which point she "got up and went to the bathroom." (Tr. 675-76).

**Elissia Sherrill**

Elissia testified that she loved Petitioner and considered him to be her father. (Trial Transcript, December 3, 2004, 683-84). Elissia accompanied Petitioner to the trial and expressed a desire to support him. (Tr. 684). Prior to the incident in question, Elissia and Latotiana (a.k.a.

Tottie) were "very close friends" between whom there were no problems. (Tr. 679-80). The pair would regularly spend time at each other's house. (Tr. 686-87).

At some point subsequent to December 2001, Latotiana told Elissia that Petitioner "had tried to touch her." (Tr. 680-81). Latotiana later told Elissia that Petitioner "didn't touch her." (Tr. 681). Elissia did not remember anything about the night in question. (Tr. 685, 687). Elissia conceded that she did not know what happened to Latotiana on the night in question, but Elissia did remember seeing Latotiana crying one morning after spending the night at her house. (Tr. 696-97). When Elissia asked Latotiana "what was wrong with her," Latotiana "didn't say nothing." (Tr. 699). Elissia then told her mother that Latotiana was crying. (Tr. 699). Carletta Coleman then spoke "privately" with Latotiana. (Tr. 699-700). Elissia testified that after the incident in question, Latotiana continued to visit her residence, even when Petitioner was present. (Tr. 724).

**Gary Miles**

Miles testified that he was employed as a Detective Sergeant with the Michigan State Police and had worked for the Michigan State Police for approximately 30 years "in a variety of capacities, most of which involve criminal investigations." (Trial Transcript, December 3, 2004, 756). Detective Sergeant Miles interviewed Petitioner on October 31, 2002. (Tr. 760).

During this interview, Petitioner consistently denied sexually assaulting Latotiana McClain. (Tr. 765). Petitioner stated that he had always gotten along well with Latotiana and that he "don't know anything bad about her." (Tr. 770). Petitioner acknowledged that on the night in question, his wife "came home at ten o'clock and then she left later that night." (Tr. 784). Petitioner initially indicated that his wife was gone for ten minutes, but later stated that she was gone for less

than ten minutes.  (Tr. 787).

Petitioner told Miles that the morning after the incident in question, his wife "came and spoke to him about [Latotiana's] allegations."  (Tr. 770-71).  Petitioner wanted to speak with Latotiana's mother about the matter, but his wife asked him not to, indicating that she would instead discuss the matter with Latotiana's mother.  (Tr. 771-72).  Petitioner stated that he nevertheless spoke with Latotiana's mother about the matter and was the person that first informed her of Latotiana's allegations. (Tr. 787-89).  Petitioner later contradicted himself by repeatedly stating that he never spoke with Latotiana's mother about the incident in question. (Tr. 787-91).  Petitioner told Miles that he later "told [Sergeant George] Hubbard to come over with me, I'm going to tell [Latotiana's mother] to make this kid stop blabbing."  (Tr. 793-94).

**George Hubbard**

As of September 2002, Hubbard was employed as a Sergeant with the Muskegon Heights Police Department.  (Trial Transcript, December 3, 2004, 881-83).  At that time, Petitioner was also employed as a Sergeant with the Muskegon Heights Police Department.  (Tr. 882).

In September 2002, Petitioner approached Hubbard and informed him that a child had accused him of sexual assault.  (Tr. 883).  Petitioner told Hubbard that he wanted to "set up a meeting with the girl's mother and [Petitioner and Hubbard] to discuss the issue."  (Tr. 883).  Petitioner did not suggest to Hubbard that he investigate the matter, but rather indicated that he wanted "this to be stopped." (Tr. 917-18).  Hubbard responded that he "didn't think that was a good idea" for the child's mother to learn of the allegations in this manner.  (Tr. 883-84).  Hubbard also did not believe it would be appropriate for Petitioner, as the alleged perpetrator, to participate in a

10

discussion with the alleged victim's mother. (Tr. 884). Hubbard instead suggested that Petitioner "wait at the police department" while Hubbard spoke with Latotiana's mother. (Tr. 884).

Hubbard then traveled to Martha Miller's residence and informed her of the allegations against Petitioner. (Tr. 885-86). Miller then spoke with Latotiana who informed her mother of the incident in question. (Tr. 886-87). Miller told Hubbard that she wanted the matter investigated. (Tr. 893-94). Hubbard then drafted a memorandum to the Chief of Police regarding the matter. (Tr. 894).

Hubbard acknowledged that he had not been assigned or directed to speak with Miller regarding Latotiana's allegations. (Tr. 911-12). Hubbard also acknowledged that he was friends with Petitioner at the time. (Tr. 882, 897, 923).

**George Smith**

Smith testified that he had been employed as Chief of Police for the City of Muskegon Heights for more than nine years. (Trial Transcript, December 3, 2004, 930-31). After receiving Sergeant Hubbard's memorandum regarding Latotiana's allegations, Chief Smith requested that the State Police "investigate the case and report it to the prosecutor." (Tr. 933-34).

**Danyell Sherrill**

Sherrill testified that Carletta Coleman was her mother and Petitioner was her step-father. (Trial Transcript, December 3, 2004, 948-49). Sherrill testified that she was presently 20 years of age. (Tr. 948). As of December 2001, Sherrill was living in her mother's residence. (Tr. 948-49). At approximately 11:30 p.m. on the night in question, Sherrill and her mother left to go

11

to the store.  (Tr. 959).  The pair was gone 15-20 minutes.  (Tr. 959-64).  When they returned from

the store, one of the other children had to unlock the door to the house because neither Sherrill nor

Coleman had a house key.  (Tr. 960-62).  When she returned from the store, Sherrill observed

Latotiana sleeping in one of the bedrooms.  (Tr. 962-63).  Even after the incident in question,

Latotiana continued to visit her house even when Petitioner was present.  (Tr. 967-68).


**Cynthia Coleman**

Coleman testified that she was Petitioner's former wife.  (Trial Transcript, December

8, 2004, 1009-10).  The pair married in 1979 and remained married for sixteen and one-half years.

(Tr. 1010).  Petitioner is the father of three of Coleman's five children.  (Tr. 1009-10).  While

Petitioner is not the father of Coleman's daughter, Brianna, Petitioner is the only father she has ever

known.  (Tr. 1009-10).  Accordingly, Brianna would often visit Petitioner after he and Coleman

were divorced.  (Tr. 1010).


**Brianna Porcia**

On the night of the alleged incident, Brianna stayed at Petitioner's residence.  (Trial

Transcript, December 8, 2004, 1036-39).  When she arrived at Petitioner's house that evening,

Elissia and Latotiana were "asleep on the couch."  (Tr. 1042).  Carletta Coleman and Danyell then

left to go to the store at which point Brianna went into one of the bedrooms to watch television.  (Tr.

1044-47).  By this time, Latotiana had moved to this bedroom and was asleep on the bed.  (Tr. 1045-

47).  Brianna stayed in the bedroom and watched television "for a long time" before her mother and

Danyell returned from the store.  (Tr. 1047-49).  Petitioner was in the basement the entire time her

12

mother and Danyell were at the store.  (Tr. 1048-49).  Petitioner did not enter this bedroom during

that time and neither she nor Latotiana exited the bedroom during this time.  (Tr. 1049-50).  The

following morning, Brianna saw Latotiana crying.  (Tr. 1065).  Brianna did not ask Latotiana why

she was crying.  (Tr. 1065).

             After later hearing "allegations against" Petitioner from a friend at school, Brianna

asked Petitioner "did he rape Latotiana."  (Tr. 1028-30).  Petitioner denied these allegations.  (Tr.

1030).  Brianna later spoke with Latotiana regarding her allegations.  (Tr. 1096).  During this

conversation, Latotiana "kept changing her story."  (Tr. 1096-97).  Latotiana first claimed that

Petitioner "tried to touch her," then stated that Petitioner "raped her," asserted that Petitioner "tried

to," and then said "it never happened."  (Tr. 1097).  After the incident in question Latotiana

continued to spend time at Petitioner's residence, even when Petitioner was present.  (Tr. 1051).

**Carletta Coleman**

             Coleman testified that Latotiana continued to visit her house after the incident in

question, but never again stayed overnight at her house.  (Trial Transcript, December 8, 2004, 1135-

36).

**Shawn Baker**

             Trooper Baker testified on rebuttal concerning interviews she conducted with Danyell

Sherrill and Brianna Porcia.  During their first interview, Danyell asserted that when she and her

mother left to go to the store on the night in question Brianna was "asleep in her bedroom."  (Trial

Transcript, December 8, 2004, 1142-43).  During their second interview, Danyell asserted that

Brianna was on the couch watching television when they left to go to the store.  (Tr. 1142-43).

Baker testified, however, that when she interviewed Brianna about this matter Brianna kept asserting

that she was not at Petitioner's house on the night in question.  (Tr. 1143-46).

Following the presentation of evidence, the jury found Petitioner guilty of first degree

criminal sexual conduct.  (Trial Transcript, December 9, 2004, 1282-85).  Petitioner was sentenced

to serve 56 to 240 months in prison.[1]  (Sentence Transcript, January 12, 2005, 45).  Petitioner

appealed his convictions in the Michigan Court of Appeals, asserting the following claims:

> I.     Was Defendant deprived of a fair trial where plain
> error occurred when evidence was presented that
> witnesses were experts in evaluating the credibility of
> child sexual abuse complainants and that those
> witnesses saw no "red flags" indicating that this
> complainant had made up her accusations or been
> coached?

> II.    Was Defendant deprived of effective assistance of
> counsel by his attorney's failure to object to the
> admission of the testimony of witnesses Peterson and
> Baker that they had expert qualifications which
> allowed them to determine that the complainant was
> not making up the accusation against Defendant?

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Coleman*,

2006 WL 2632296 (Mich. Ct. App., Sept. 14, 2006).  Petitioner subsequently moved in the Michigan

Supreme Court for leave to appeal asserting the following claims:

> I.     Was Defendant deprived of a fair trial where plain
> error occurred when evidence was presented that
> witnesses were experts in evaluating the credibility of
> child sexual abuse complainants and that those
> witnesses saw no "red flags" indicating that this
> complainant had made up her accusations or been

---

[1]  Petitioner has since been released from prison.

14

coached?

II.    Was Defendant deprived of effective assistance of counsel by his attorney's failure to object to the admission of the testimony of witnesses Peterson and Baker that they had expert qualifications which allowed them to determine that the complainant was not making up the accusation against Defendant?

III.    Was Defendant denied his 6th Amendment right to effective assistance of appellate counsel by counsel's failure to timely provide a copy of the trial transcripts, so the Defendant could exercise his rights to file a pro per supplemental brief on appeal raising reversible issues appointed counsel refused to raise in Defendant's appeal brief?

IV.    Was Defendant denied his constitutional right to effective assistance of trial counsel where trial counsel failed to disclose plea offer by the prosecution until after verdict?

V.    Was Defendant denied his constitutional right to effective assistance of trial counsel, where trial counsel failed to object to the jury's verdict not being supported by evidence?

The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Coleman,* 729 N.W.2d 509 (Mich. 2007). On April 28, 2008, Petitioner initiated the present action in which he asserts the following claims:

I.    Was Defendant's substantial constitutional rights to a fair trial violated mandating reversal, where the prosecutor's expert witness was allowed to vouch for the credibility of the complainant?

II.    The Defendant was denied effective assistance of counsel in violation of his Sixth Amendment right, where counsel failed to object to expert witnesses vouching for the credibility of the complainant.

15

## STANDARD OF REVIEW

Coleman's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.   The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect

that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the

17

merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de

18

novo.  *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where

state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir.

2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not

addressed by the state courts).

## ANALYSIS

I.          **Improper Vouching**

Petitioner asserts that his right to a fair trial was violated by the introduction of

testimony concerning the victim's credibility and by the prosecutor's discussion of such during his

closing argument.  Specifically, Petitioner objects to the introduction of certain testimony by Melissa

Peterson, Shawn Baker, Sue Johnson, as well as the subsequent discussion of such by the prosecutor

in his closing argument.[2]

The testimony by Melissa Peterson to which Petitioner objects (elicited during direct

examination by the prosecutor) is as follows:

> Q:      OK.    Now while [Latotiana is describing her
> allegations against Petitioner], are you looking for
> things like her demeanor, how she's acting?
>
> A:      Yes.
>
> Q:      Was there any indication in what she was saying or
> how she was acting that she was being - that she had
> been influenced or coached in some way?

---

[2]  In the state court, Petitioner argued that the introduction of the testimony by Peterson and Baker violated his
right to a fair trial.  Petitioner advanced no claim that his right to a fair trial was violated by the admission of testimony by
Sue Johnson or the prosecutor's closing argument concerning any of the challenged testimony.  Petitioner has, therefore,
failed to properly exhaust these latter claims.  This failure notwithstanding, such claims may nevertheless be denied
because as discussed herein they are without merit.  *See* 28 U.S.C. § 2254(b)(2).

A:      No.

Q:      Was there any indication as you were watching her that she was making things up?

A:      No.

Q:      None of the red flags or signals that you're trained to look for were there.

A:      Correct.

Q:      In terms of deception, I mean.

A:      Correct.

(Trial Transcript, December 2, 2004, 479-80).

The testimony by Shawn Baker to which Petitioner objects (elicited during direct

examination by the prosecutor) is as follows:

Q:      Now without telling us exactly what [Latotiana] said, we may get into that later, depending on how your testimony goes, but you said you were there to determine in part whether or not there were any red flags or signals that she was lying, for example.

A:      Yeah.

Q:      Did you see any such red flags or motives?

A:      No, I did not see any red flags.

Q:      Were you looking for them?

A:      Yes.

Q:      You're trained to look for them?

A:      Yes.

Q:      In other investigations that you've done, have you ever been able to identify that children have reasons

20

> that become apparent in your interview that they're making this up?
>
> A:     Yes.
>
> Q:     You also look for motivations in terms of whether or not a child has been coached or told what to say?
>
> A:     Yes.

(Tr. 589-90).

The testimony by Sue Johnson to which Petitioner objects (elicited during direct examination by the prosecutor) is as follows:

> Q:     Now in the course of your interview of Latotiana, without telling us what she said at this point, did you become aware that she had continued to have contact at least with the residence or the perpetrator's home?
>
> A:     I did become aware of that.
>
> Q:     Did you have - did you become aware of the fact that she didn't scream or cry out when this occurred?
>
> A:     Yes, I was aware of that also.
>
> Q:     Were you aware that she didn't tell her parent right away, her mother?
>
> A:     Yes, I was aware of that.
>
> Q:     Did any of those things cause you to see red flags in terms of her credibility, whether or not she could be believed or not?
>
> A:     No.  I found those things in the normal range of responses.
>
> Q:     And about that, again, at least at this point I can't - I won't be asking you what she said, but were - when you're in there, are you looking for signs of deception, some red flags of why a child may not be

21

truthful?

A:     Yes, we do.

(Trial Transcript, December 3, 2004, 650-51).

The portion of the prosecutor's closing argument to which Petitioner objects is as follows:

> Sue Johnson and Trooper Baker - all I'm going to say to you about them - these are trained investigators who have been doing this for a long time who are there to try to ferret and look for red signs or these red flags or these signs that a child has been coached or the child has been brainwashed or there's some motive. They told you that based upon their training and experience and based upon their camaraderie with Latotiana there were no indications that she was lying. There were no indications she had been coached. And although they're not infallible, they're expert testimony in this regard is important in terms of evaluating the credibility of the victim.

(Trial Transcript, December 8, 2004, 1195).

Petitioner did not object at trial to any of the questioning or argument identified above. With respect to Petitioner's claims regarding the testimony offered by Peterson and Baker (the only claims presented in the state court), the Michigan Court of Appeals found that "[b]ecause defendant failed to object to this testimony at trial, the issue is unpreserved." *Coleman*, 2006 WL 2632296 at *2. As the court further concluded, such "unpreserved claims of error" are reviewed only "for plain error affecting defendant's substantial rights." *Id.* Such constitutes a procedural default of such claims.

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address a petitioner's claims because of a failure to satisfy state procedural requirements. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). Where a petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate

state ground precluding review by a federal court.  *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).  If a claim has been procedurally defaulted, federal habeas review is available only if the petitioner can establish either (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice.  *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004) (citing *Coleman*, 501 U.S. at 750).

The Sixth Circuit employs a multi-part test to determine if a petitioner has procedurally defaulted a particular issue: (1) there must exist a state procedural rule that is applicable to the claim and with which the petitioner failed to comply, (2) the last state court rendering a judgment in the matter must have actually enforced the state procedural rule, and (3) application of the procedural rule in question must constitute an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim.  *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004); *Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000).

All of these elements are satisfied in this instance.  First, Michigan employs a procedural rule that generally obligates defendants to preserve all constitutional and non-constitutional claims by first asserting them at trial.  *See Warlick v. Romanowski*, 367 Fed. Appx. 634, 640 (6th Cir., Mar. 3, 2010) (citing *People v. Grant*, 520 N.W.2d 123, 128 (Mich. 1994)).  Second, During his trial, Petitioner failed to object to the testimony and argument at issue.  The Michigan Court of Appeals, the last state court that rendered a judgment in this matter, determined that this issue was "unpreserved" because Petitioner "failed to object. . .at trial." *Coleman*, 2006 WL 2632296 at *2.  While the court of appeals nevertheless reviewed this claim "for plain error affecting

23

defendant's substantial rights," such does not constitute a review on the merits sufficient to excuse procedural default. *See Fleming v. Metrish*, 556 F.3d 520, 530 (6th Cir. 2009)) (it is well established that "a state court's application of plain-error review does not revive a habeas petitioner's otherwise procedurally defaulted claim on collateral review"); *Johnson v. Wolfenbarger*, 391 Fed. Appx. 510, 513 (6th Cir., Aug. 17, 2010) (same). Finally, the procedural rule in question constitutes an adequate and independent basis to preclude review by this Court because the rule was "firmly established and regularly followed by the time as of which it [was] to be applied." *Romanowski*, 367 Fed. Appx. at 640.

Petitioner, therefore, has procedurally defaulted his claims regarding the testimony of Peterson and Baker. Accordingly, federal habeas review is available only if he can establish either (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice. *See Bagley*, 380 F.3d at 966 (citing *Coleman*, 501 U.S. at 750).

With respect to cause, Petitioner must demonstrate the existence of some objective factor, external to the defense, which impeded his efforts to comply with the applicable procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Johnson v. Wilson*, 187 Fed. Appx. 455, 458 (6th Cir., June 16, 2006). To establish that a miscarriage of justice would result from the failure to review his procedurally defaulted claims, Petitioner must make a "colorable showing of factual innocence." *McCleskey v. Zant*, 499 U.S. 467, 495 (1991). To satisfy this requirement, Petitioner must demonstrate the existence of new and reliable evidence, not presented at trial, which establishes that some constitutional error "probably resulted" in the conviction of an innocent person. *See Schlup v. Delo*, 513 U.S. 298, 324-27 (1995). The evidence must show that it is "more

likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 326-27.

Petitioner asserts that ineffective assistance by his trial attorney establishes cause for his failure to contemporaneously object to the testimony in question. Even assuming, however, that such establishes cause Petitioner cannot establish prejudice because as discussed below, these claims are without merit. Petitioner has also failed to advance any argument that failure by this Court to consider the merits of these claims would result in a fundamental miscarriage of justice. Accordingly, because Petitioner has procedurally defaulted the particular claims, the Court is precluded from considering such. Furthermore, even if Petitioner could overcome his default, the result is the same as none of the claims identified above have merit.

It is well established that a prosecutor "may not express a personal opinion concerning the credibility of a trial witness because to do so exceeds the legitimate advocate's role by improperly inviting the jury to convict on a basis other than a neutral independent assessment of the record proof." *United States v. Owens*, 426 F.3d 800, 806 (6th Cir. 2005) (citations omitted). Likewise, it is improper for a lay witness or an expert witness to offer an opinion vouching for the credibility of another witness. *See, e.g., Engesser v. Dooley*, 457 F.3d 731, 736 (8th Cir. 2006); *United States v. New*, 491 F.3d 369, 378 (8th Cir. 2007); *Maurer v. Department of Corrections*, 32 F.3d 1286, 1289 (8th Cir. 1994). The introduction of such testimony or argument, however, does not automatically render unconstitutional the conviction in question. Instead, the question is whether the introduction of such was "so prejudicial as to be fundamentally unfair, thus denying the defendant a fair trial." *Engesser*, 457 F.3d at 736; *see also, Maurer*, 32 F.3d at 1289; *Bedford v. Collins*, 567 F.3d 225, 233-34 (6th Cir. 2009).

25

On this particular topic, the United States Supreme Court has observed that "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Dowling v. United States*, 493 U.S. 342, 352 (1990). Accordingly, the Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Id.* The *Dowling* Court further cautioned that:

> Judges are not free, in defining due process, to impose on law enforcement officials their personal and private notions of fairness and to disregard the limits that bind judges in their judicial function. They are to determine only whether the action complained of violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency.

*Id.* at 352-53 (internal citations omitted).

Melissa Peterson testified that she had dealt with "thousands" of children in the course of her employment. (Trial Transcript, December 2, 2004, 470). Peterson testified that when interviewing the victim she kept "an open mind" concerning her allegations, but was nonetheless "looking for signs that [the victim] had been coached or that she was lying" as she (Peterson) had been trained to do. (Tr. 473-80). Peterson was permitted to testify as an expert in the field of child sexual abuse. (Tr. 481-83).

While Peterson testified that she observed "none of the red flags or signals" which might suggest that the victim was "making things up" or "had been influenced or coached in some way," (Tr. 479), she did not testify that the victim was credible or that the absence of such "red flags or signals" indicated that the victim was telling the truth. In fact, Peterson testified that children do, in fact, lie about allegations of sexual abuse. (Tr. 483-84). Moreover, Peterson did not testify or suggest that Petitioner was guilty or that the victim had been sexually abused. Instead, Peterson

simply testified, in light of her specialized training and experience, to her first-hand observations of the victim.  The jury was free to conclude that while Peterson may not have observed an "red flags or signals" that the victim nonetheless fabricated her allegations.  The Court discerns nothing improper about Peterson's testimony and finds that such did not deprive Petitioner of the right to a fair trial.  *See, e.g., Hobgood v. Epps*, 2011 WL 1297063 at *5-6 (S.D. Miss., Mar. 31, 2011) (no due process violation where psychotherapist "never stated that the victim was telling the truth," but instead merely testified that "the consistency of the victim's statements made him credible"); *United States v. Eagle*, 515 F.3d 794, 800 (8th Cir. 2008) (in child sexual abuse cases, it is acceptable for an expert witness to "inform the jury of characteristics in sexually abused children and describe the characteristics the alleged victim exhibits").

Trooper Baker testified that she had spent the previous three years investigating criminal sexual conduct cases and that during such time she had investigated approximately 150 cases.  (Trial Transcript, December 2, 2004, 581).  Baker testified that she participated in "specialized training" regarding "how to talk to kids without coaching them or without suggesting things to them."  (Tr. 583).  As part of this training, Baker was trained to discern "red flags or signals" that might suggest that a child had been coached, was being less than truthful, or had a motive to fabricate allegations.  (Tr. 583-90).  Baker testified that she observed no "red flags or signals" which might suggest that the victim was being dishonest.  (Tr. 589-90).

However, Baker did not testify that the victim was credible or that the absence of such "red flags or signals" indicated that the victim was telling the truth.  Baker also testified that children do lie about allegations of sexual abuse.  (Tr. 590).  Baker did not testify or suggest that Petitioner was guilty or that the victim had been sexually abused.  Instead, Baker simply testified,

27

in light of her specialized training and experience, to her first-hand observations of the victim.  The

jury was free to conclude that while Baker may not have observed an "red flags or signals" that the

victim nonetheless fabricated her allegations.  The Court discerns nothing improper about Baker's

testimony and finds that such did not deprive Petitioner of the right to a fair trial.  *See, e.g.,*

*Hobgood*, 2011 WL 1297063 at *5-6; *Eagle*, 515 F.3d at 800.

        Sue Johnson testified that she had been employed as an investigator for Children's

Protective Services for more than seventeen years.  (Trial Transcript, December 3, 2004, 616-17).

Johnson testified that children "often" fail to inform a parent "right away about sexual abuse" and

that it is "typical" for "a child to continue to have contact with an offender when that offender is

someone they know and trust and care about."  (Tr. 644-45).  Johnson further testified that it is

"typical" for a child "to not cry out or to ask for help or to scream while the assault is occurring

when it involves someone they know, care and trust."  (Tr. 645).  Johnson testified that the fact that

the victim in this case: (1) did not immediately inform her mother of the incident in question; (2)

continued to visit Petitioner's residence after December 2001; and (3) did not "scream or cry out"

when she was assaulted did not raise any "red flags" in her mind concerning the victim's allegations.

(Tr. 650-51).  Johnson testified that the victim's actions in this regard were "in the normal range of

responses."  (Tr. 651).

        Johnson did not, however, testify that the victim was credible or that the absence of

"red flags" constituted evidence that the victim was telling the truth.  Johnson did not testify or

suggest that Petitioner was guilty or that the victim had been sexually abused.  Johnson merely

testified, in light of her training and experience, to her first-hand observations of the victim.  The

jury was free to credit Johnson's testimony but nonetheless conclude that the victim was not sexually

28

assaulted.  The Court discerns nothing improper about Johnson's testimony and finds that such did not deprive Petitioner of the right to a fair trial.  *See, e.g., Hobgood*, 2011 WL 1297063 at *5-6; *Eagle*, 515 F.3d at 800.

Finally, the prosecutor did not improperly vouch for the victim's credibility or express any opinion regarding such.  Instead, the prosecutor merely commented on the evidence in question which he is entitled to do.  *See, e.g., United States v. Collins*, 78 F.3d 1021, 1039-1040 (6th Cir. 1996) (while it is improper for an attorney to express a personal opinion or belief as to the truth or falsity of any testimony, an attorney "must be given leeway to argue reasonable inferences from the evidence"); *United States v. Reliford*, 58 F.3d 247, 250-51 (6th Cir. 1995) (so long as he does not improperly vouch for a witness, it is proper for the prosecutor to review the evidence presented and comment on the strength of the State's case); *Taylor v. United States*, 985 F.2d 844, 846 (6th Cir. 1993) (improper vouching occurs only when a jury could "reasonably believe that the prosecutor was indicating a personal belief in a witness' credibility").  The Court finds nothing improper about the comments in question and conclude that such did not deprive Petitioner of the right to a fair trial.  *See, e.g., Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006); *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007).

In conclusion, the Court concludes that introduction of the evidence and argument in question was proper and did not deprive Petitioner of the right to a fair trial.  Accordingly, these particular claims present no issue on which habeas relief may be granted.

## II.        Ineffective Assistance of Counsel

Petitioner asserts that his right to the effective assistance of counsel was violated

29

when his trial attorney failed to object to the testimony and argument identified above.  While Petitioner asserted in the state courts an ineffective assistance of counsel claim, such was premised only on counsel's failure to object to the testimony of Melissa Peterson and Shawn Baker.  Thus, to the extent that Petitioner now asserts that his attorney was ineffective for failing to object to the testimony of Sue Johnson or the prosecutor's closing argument, such claims have not been properly exhausted.  As previously noted, however, Petitioner's failure to properly exhaust such claims notwithstanding, such can be denied on the merits.  *See* 28 U.S.C. § 2254(b)(2).

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.  *See Premo v. Moore*, 131 S.Ct. 733, 739 (2011) (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411 (2009)).  To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Premo*, 131 S.Ct. at 739 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 689).  Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.  Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 131 S.Ct. at 739 (quoting *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).  The issue is whether

30

counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 690). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one." *Premo*, 131 S.Ct. at 740. Likewise, the standard by which petitions for habeas relief are judged is "highly deferential." Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential. *Id.* (citations omitted). As the Supreme Court recently concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (internal citations omitted).

With respect to Petitioner's claim that his attorney rendered ineffective assistance when she failed to object to the testimony (detailed above) offered by Melissa Peterson and Shawn Baker, the Michigan Court of Appeals rejected such. *Coleman*, 2006 WL 2632296 at *4. As the court concluded:

> Given our conclusion that the testimony of Peterson and Baker was permissible, we reject defendant's claim that his trial counsel was ineffective for failing to object to that testimony. Counsel is not ineffective for failing to advocate a meritless position or to make a

31

futile objection.

*Id.*

This conclusion is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, it is not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

As for Petitioner's claim that counsel was ineffective for failing to object to the testimony of Sue Johnson or the prosecutor's closing argument, the result is the same.  As discussed above, the evidence in question was not improper.  Thus, Petitioner cannot establish that counsel was deficient for failing to object to such nor can he establish that he was prejudiced by counsel's conduct.  Accordingly, this claim is without merit and cannot form the basis for habeas relief.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Coleman's petition for writ of habeas corpus be **denied**.  The undersigned further recommends that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file

objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  June 29, 2011

 /s/ Ellen S. Carmody

ELLEN S. CARMODY
United States Magistrate Judge